UNITED STATES of America

v.

STATE OF LOUISIANA: Louisiana State Board of Education, Edward Bopp, as President of the Louisiana State Board of Education, Earl Ingram, as Acting Director of the Louisiana State Board of Education, Lewis Michot, as ex Officio Secretary of the Louisiana State Board of Education; Jesse Bankston, Frederick Eagan, Harvey Peltier, Robert Curry, W.E. Whetstone, Boyd Woodard, A.J. Roy, Charles Colbert, Richard D'Aquin, Enoch Nix, Members of the Louisiana State Board of Education; Louisiana Coordinating Council for Higher Education: William Arceneaux, as Executive Director of the Louisiana Coordinating Council for Higher Education, Jesse Bankston, W.J. Defelice, Mrs. Moise W. Dennery, Albert W. Dent, Ewell Eagan, Fred C. Frey, Eugene G. Gouaux, J.K. Haynes, Thomas James, Troy Middleton, Leonard W. Phillips, Joe D. Smith, Jr., A.L. Swanson, John Phistlethwaite, D.S. Young, Members of the Louisiana Coordinating Council for Higher Education; Louisiana State Board of Supervisors: Carlos G. Spaht, as Chairman of the Louisiana State Board of Supervisors, Edward W. Edwards, as ex Officio Member, William T. Brown, Jimmy H. Davis, Gordon E. Dore, Murphy J. Foster, A. Eglin McKeithen, Lewis H. Padgett, William S. Peck, James R. Peltier, Sargent Pitcher, John Sherrouse, Jr., James T. Staples, Oliver P. Stockwell, A.L. Swanson, Members of the Louisiana State Board of Supervisors; Louisiana Board of Regents: William Arceneaux, Jesse Bankston, Edward Bopp, William T. Brown, Charles Colbert, Robert Curry, Richard D'Aquin, Jimmy H. Davis, W.J. Defelice, Moise W. Dennery, Albert W. Dent, Gordon E. Dore, Ewell Eagan, Frederick Eagan, Murphy J. Foster, Fred C. Frey, Eugene G. Gouaux, J.K. Haynes, Thomas James, A. Eglin McKeithen, Troy Middleton, Enoch Nix, Lewis H. Padgett, William S. Peck, Harvey Peltier, James R. Peltier, Leonard W. Phillips, John Phistlethwaite, Sargent Pitcher, A.J. Roy, John Sherrouse, Jr., Joe D. Smith, Jr., Carlos Spaht, James T. Staples, Oliver P. Stockwell, A.L. Swanson, W.E. Whetstone, Boyd Woodard, D.S. Young, Members of the Louisiana Board of Regents.

Civ. A. No. 80–3300.

United States District Court, E.D. Louisiana.

Oct. 30, 1990.

Donald L. Beckner, U.S. Atty., Baton Rouge, La., Howard L. Sribnick, Jay Heubert, Atty., U.S. Dept. of Justice, Washington, D.C., Franz R. Marshall, Educational Opportunities Section, Civ. Rights Div., U.S. Dept. of Justice, Washington, D.C., P. Raymond Lamonica, U.S. Atty., Baton Rouge, La., for U.S.

W.S. McKenzie, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for LSU Bd. of Sup'rs and its Members.

Kendall L. Vick, Paul A. Eckert, Asst. Atty. Gen., New Orleans, La., for all other State defendants.

Robert C. Williams, Baton Rouge, La., for NAACP.

Curtis A. Calloway, Baton Rouge, La., for Southern University Alumni Ass'n, its President Dr. George Merrick and Grambling College Alumni Ass'n, its President, W.O. Thompson.

M. Aubrey McCleary, Jr., McCollister, Belcher, McCleary & Fazio, Baton Rouge, La., for Southern Ass'n of Colleges & Schools Inc.

Henry N. Brown, Jr., Dist. Atty., Benton, La., for Bossier Parish School Bd.

Robert C. Williams, Baton Rouge, La., for Treavor Brown, et al., amicus.

Trevor G. Bryan, Vincent P. Blanson, William J. Jefferson, Jefferson, Bryan, Jupiter, Lewis & Blanson, New Orleans, La., for Southern University Bd. of Sup'rs.

Margaret E. Woodward, New Orleans, La., for Bd. of Regents of State of La.

Carla Calobrisi, Joseph J. Levin, Jr., Washington, D.C., for State of La.

Paul W. Murrill, Baton Rouge, La.

Frank E. Vandiver, Director, Master Institute for Defense Studies, Texas A & M University, College Station, Tex.

Franklyn Jenifer, President, Howard University, Washington, D.C.

Curtis A. Calloway, Baton Rouge, La., Thomas N. Todd, Chicago, Ill., for Grambling State University Alumni Ass'n.

W. Shelby McKenzie, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for Bd. of Sup'rs of Louisiana State University.

John N. Kennedy, Sp. Counsel to the Governor, State of La., Baton Rouge, La., for Governor Buddy Roemer.

Robert A. Kutcher, Jan Marie Hayden, Bronfin, Heller, Steinberg & Berins, New Orleans, La., for State Bd. of Trustees.

Winston DeCuir, Asst. Atty. Gen., Dept. of Justice, Baton Rouge, La., for State of La. State Bd. of Elementary and Secondary Educ.

Paul R. Verkuil, Sp. Master, College of William & Mary, University Relations, Williamsburg, Va.

Max Nathan, Jr., Sessions, Fishman, Rosenson, Boisfontaine, Nathan & Winn, New Orleans, La., David Boies, New York City, for Counsel to Sp. Master.

James M. Weiss, Mary Ellen Roy, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Capital City Press, Times Picayune.

William J. Guste, Jr., Atty. Gen., Kenneth C. De Jean, Winston Riddick, David Sanders, New Orleans, La., for Atty. Gen. of the State of La.

William J. Guste, Jr., Atty. Gen. of Louisiana, Thomas S. Halligan, Asst. Atty. Gen., Paul R. Baier, Sp. Asst. Atty. Gen. (Louisiana), Louisiana Dept. of Justice, Baton Rouge, La., for State of La.

## ORDER & REASONS

CHARLES SCHWARTZ, Jr., District Judge.

Pursuant to Paragraph 3 of the Order of September 21, 1990 [R.Doc. No. 541], the parties have submitted in writing any objections to the proposed remedial order attached as Exhibit A of that Order (the "Proposed New Plan").[1] The Court rules as follows.

The following parties have responded to the Order: the United States of America; the State of Louisiana, appearing through Charles E. Roemer III, Governor of the State of Louisiana, the Board of Regents of the State of Louisiana ("Regents"), the Board of Trustees for the Louisiana State Colleges and Universities ("Trustees"), and the Board of Supervisors of Louisiana State Universities and Agricultural and Mechanical Colleges ("LSU"), *jointly;* the Board of Supervisors of Southern University and A & M College ("Southern"); William J. Guste, Attorney General of the State of Louisiana, amicus curiae; and the Grambling State University Alumni Association ("GSUAA"), amicus curiae.

█ The Attorney General's response is rejected out of hand as not being responsive to this Court's Order. He responds by alleging that the Proposed New Plan is unnecessary and seeks execution of identically the same order and activity that has been stayed earlier by the Supreme Court. He further alleges that the prior orders are appealable as a final judgment. Whether this Court's prior remedial orders were appealable is immaterial, for it addresses the wrong question: in the order of remand, the Fifth Circuit specifically contemplated this Court's revising its remedial plan:

> IT IS FURTHER ORDERED that the motions to remand filed by the State of Louisiana, acting through its Governor, Charles E. "Buddy" Roemer, III, and by the United States of America, are GRANTED, and the cause is remanded to the district court so that it, in the first instance, may make the desired scheduling or implementation dates or related adjustments to its challenged orders and consider the pending matters concerning representation of the State, as well as act on matters ancillary or related to any of the foregoing, including any request for stay.

The Court can only conclude that this unresponsive reply is designed to delay any ultimate resolution of this case. On the one hand, any revision to the Proposed New Plan will not, in any way, prevent any party from filing an appeal. On the other, the Court's revision of the remedial plan will obviate any unnecessary waste of judicial time and expense of all the parties in the event that the plan is affirmed on final appeal and will make it unnecessary to remand the matter to this Court for a new time table. It should be obvious to any attorney that the Court's sole purpose of requesting revisions to the Proposed New Plan was to provide for an orderly and expeditious resolution of this case, reserv-

---

1. Exhibit A was, in effect, the Court's proposed revision to the Opinion and Order of July 19, 1989, 718 F.Supp. 499, as supplemented by an Order of August 4, 1989, 718 F.Supp. 525.

ing all rights to appeal. There is a trite saying that "justice delayed is justice denied." To accede to the Attorney General's "objections" could result in needless delay.

The United States responds that it has no new objection to the Proposed New Plan and fully reserves all its objections previously filed on August 1, 1989.

■ The objections of the State, Regents, Trustees, and LSU contain merit. In some instances, the Court has fixed dates that are too ambitious; accordingly, the Court revised the Proposed New Plan as follows:

Paragraphs 1, 6, 7, 8, 9, 10, 12, 13, 15, 16, 17, 18, 19, 21, 23, 27, 28, 32, 34A and 35 are amended to provide for 30 additional days.

Paragraph 15 is amended to provide for "the *second* school year following the Implementation School Year."

The Orders of July 19 and August 4, 1989 were "keyed to" dates that were effective from the date of entry of those orders by the Clerk of this Court, whereas the Proposed New Plan is keyed to the "Implementation Date" and the "Implementation School Year." Accordingly, in order to insure proper supervision of any remedial plan for the same period of time, it is appropriate to extend the term of the injunction to seven years. Nothing herein, however, would preclude a party at some later date from moving to dissolve the injunction on the basis that the goals of the remedial order have been accomplished.

GSUAA's objection is limited to a clarification whether or not the provisions of footnote 16 on page 18 of the July 19, 1989 order, 718 F.Supp. at 509, were encompassed in the Proposed New Plan by implication. The answer to that concern is an unequivocal "yes." Nothing in the Proposed New Plan is intended to affect the findings discussed on pages 1 through 28 and the first and second paragraphs of page 29 of the July 19, 1989 order, 718 F.Supp. at 502–515.

■ Southern's cryptic objection attacks the jurisdictional basis of this Court to issue its previous Orders and in no way suggests any revision to the Proposed New Plan. The Court rejects Southern's argument. If, as the Supreme Court implied, this Court lacks the jurisdiction to sit as a three-judge court in this matter, then necessarily this Court has the jurisdiction to sit as a one-judge court to adjudicate the United States' claim that Louisiana, in practice, is violating Title VI and the Fourteenth Amendment. To hold otherwise would result in an untenable "Catch 22."

The Court rejects all other objections to the Proposed New Plan and would enter a final Order herein in the form annexed hereto as Revised Exhibit A. Thus, if the Judgment to be entered hereinafter with respect to the motion for summary judgment and dismissal of this action is reversed on any appeal, the remedial order set forth in Revised Exhibit A shall be considered the Order of this Court without the necessity of any further hearing.

REVISED EXHIBIT A

United States District Court

Eastern District of Louisiana

United States of America

versus

State of Louisiana

Civil Action No. 80–3300

Section "A"

ORDER

This matter is before the Court on remand from the Fifth Circuit Court of Appeals for amendment to the District Court's Opinion and Order entered July 19, 1989,[1] as amended by the Court's Supplemental Order of August 4, 1989,[2] for the purpose of updating and amending the deadlines set forth in those Orders. Thus, pursuant to the special master's final report, with modifications by the Panel adopted *nunc pro tunc* by the Judge of Section "A," IT IS

---

1. Rec.Doc. No. 490.

2. Rec.Doc. No. 510.

HEREBY ORDERED that the Opinion and Order and Supplemental Order be and the same are HEREBY AMENDED to read as follows:

### Single Governing Board

1. Within 60 days of the Implementing Date,[3] the four boards currently governing public higher education in Louisiana shall be disbanded and their powers consolidated into a single state governing board. The new board ("board") shall be given ultimate authority over academic, budgetary, personnel and administrative affairs of each of the public institutions currently overseen by the Board of Trustees, the Southern Supervisors and the LSU Supervisors. Additionally, the board shall be given the special mission of monitoring and implementing the remedial Order of the Court and of insuring that progress toward eliminating Louisiana's racially dual education system is achieved. The board shall determine an appropriate name for the new coordinated system of higher education, such as the "University of Louisiana System." [4]

2. The board shall have seventeen voting members and one student member. The board shall elect a chair from among its members on an annual basis. The voting members shall be appointed by the Governor and confirmed by the Louisiana Senate.

Board members shall have staggered terms of five years to run from date of appointment and reappointment for one additional term shall be permitted. The initial terms shall be for three, four or five years in order to permit the staggered system to begin. These terms shall apply to six, six and five members, respectively.

The board members appointed pursuant to this Order shall include three persons chosen from the present Board of Regents, with one person to hold a three year appointment, one a four year appointment and one a five year appointment; two persons chosen from the present LSU Board of Supervisors, with one person to hold a four year appointment and one person to hold a five year appointment; two persons chosen from the present Southern Board of Supervisors, with one person to hold a four year appointment and one to hold a five year appointment; and two persons chosen from the present Board of Trustees, with one person to hold a four year appointment and one person to hold a five year appointment.[5]

In making appointments to the board, the Governor shall not only select persons with established skills and experience in higher education, but shall also select persons firmly committed to the desegregation goals of the Court's Order and the Court's methods for implementing the Order. Additionally, board members shall be selected to broadly represent the racial, ethnic, gender and geographic diversity of the state.

3. For the first five years after the Implementing Date, the Court shall reserve the right to veto the composition of the board, if the board's composition does not adequately take into consideration the goals of this Order or does not work to ensure participation by Louisiana's black citizens. In addition, the board shall appoint one student member on an annual basis, pursuant to a procedure established by the board. A black student frequently should be appointed.

4. The board shall be charged with appointing a full-time president. This person shall have an established and extensive

**3.** Except as provided in the following sentence, the term "Implementing Date" shall mean 35 calendar days following the date of entry of this Order. If one or more appeals are filed and a stay of this Order pending appeal is granted by this Court, the Fifth Circuit or the Supreme Court, then the term shall mean the date of issuance of mandate of the final appellate judgment.

**4.** The names and titles used in this Order are only suggestions; the board is free to craft different names or titles so long as they are otherwise consistent with the remedial goals of this plan.

**5.** Once these appointments are made, there will remain five more members to be appointed for three year terms; two more members to be appointed for four year terms; and one more member to be appointed for a five year term.

background in higher education governance, and a sensitivity to the educational needs of racial minorities. The president shall serve at the pleasure of the board and be delegated operational authority over the university system.

5. There shall be a substantial administrative staff to support the new president, which will utilize the personnel and resources of the Board of Regents and the three operating boards, as appropriate. The president shall have the responsibility to recommend to the board appointment and, if necessary, removal of chancellors of each of the system campuses. Additionally, a special vice-president for desegregation compliance, whose mission is to oversee implementation of the Court's plan, shall be appointed by the board upon the recommendation of the president. This special vice-president shall be responsible for developing and implementing other desegregation proposals approved by the board; for compiling data on all aspects of desegregation in Louisiana public higher education; and for reporting to the monitoring committee as hereinafter required.

6. Within 120 days after the Implementing Date, the board shall develop and implement procedures for the use of advisory committees at each state university and community college. Among their duties, these committees shall provide advice and assistance to the president and the vice-president for desegregation compliance, as requested. The size of these advisory committees shall be set by the board but shall not exceed 17 members. All state universities shall be encouraged to form such committees which will provide non-binding advice and information about campus life to the board. Like the board, these advisory committees shall be appropriately composed to further the goals of this Order.

### Classification of State Universities

7. Within 120 days after the Implementing Date, the board shall implement a scheme for classifying each state university according to its mission, taking into account its undergraduate, graduate and research programs and the degree of selectivity in admissions. Such classifications shall be consistent with the tiers set forth below and shall be designed to reduce the number of programs statewide. The board shall be especially careful to differentiate the missions and academic programs of proximate PWIs and PBIs.[6]

8. LSU A & M shall be designated by the board as the research university in the state university system and recognized as Louisiana's flagship state institution. It shall continue to have the greatest number of graduate and research programs and shall implement the most selective criteria for admission. LSU A & M's undergraduate admissions shall be limited to the top echelon of graduating high school seniors in light of standards established by the board, with selectivity based on criteria discussed below. These selective admissions standards shall be established within 120 days of the Implementing Date and implemented for the Implementation School Year.[7] All remedial education courses shall be eliminated by the Implementation School Year.

9. The board shall also designate an intermediate level of state institutions offering significant doctoral and other graduate programs in addition to four-year undergraduate programs. These universities shall be somewhat less selective than LSU

6. The abbreviations set forth herein refer to "predominantly white institutions" and "predominantly black institutions" as explained in the Court's Opinion and Order entered July 19, 1989, Rec.Doc. No. 490, at pp. 5–6. 718 F.Supp. at 504–05.

7. In this Order, the term "Implementation School Year" means the School Year commencing in the calendar year in which the date 500 days after the Implementing Date falls. For example, if the Implementing Date falls on or between October 1, 1990 and August 19, 1991, then the Implementation School Year shall be the 1992–1993 School Year; if the Implementing Date falls on or between August 20, 1991 and August 18, 1992, then the Implementation School Year shall be the 1993–1994 School Year; if the Implementing Date falls on or between August 19, 1992 and August 18, 1993, then the Implementation School Year shall be the 1994–1995 School Year.

A & M, based on criteria discussed below. The selectivity standards shall be developed within 120 days of the Implementing Date and implemented for the Implementation School Year. All remedial education courses for these universities shall be eliminated by the School Years two years following the Implementation School Year. The group of intermediate doctoral institutions shall initially be Louisiana Tech, SUBR, UNO and USL. The board shall be responsible for developing a realistic timetable for SUBR, with the imposition of selective admissions and the development of its doctoral level programs taking no more than three years.

10. The board shall designate the remaining four-year public institutions—Grambling, Nicholls, SUNO, LSU–Shreveport, McNeese, Northeast, Northwestern and Southeastern—as comprehensive universities which will have very limited graduate/research missions and less selective or open admissions. Within 120 days of the Implementing Date, the board shall set the admissions standards for all of these institutions with the exception of Grambling, which standards shall be implemented for the Implementation School Year. Care shall be taken to insure that at least some of these institutions move away from open admissions toward some degree of selectivity (which might be the requirement of completing a college preparatory curriculum).

11. With respect to admissions standards for Grambling and Louisiana Tech, the Court hereby adopts as part of its Order the stipulation of the parties appearing as Appendix B to the Special Master's Final Report, but only to the extent such stipulation and its implementation are consistent with the Court's Opinion and Order entered July 19, 1989, as amended by the Supplemental Order of August 4, 1989, and this Order.

12. Within 180 days of the Implementing Date, existing graduate programs at comprehensive universities shall be evaluated for continuance. So long as they are

educationally sound and foster the desegregation goals of this Order, some discrete, nonduplicative graduate programs may be maintained.[8] Comprehensive universities may retain remedial education programs, especially if they remain open admissions institutions. However, the primary focus for remedial education shall be shifted in the future to the community colleges, which will be solely open admissions institutions.

### Selective Admissions Standards

13. The state shall end the traditional system of open admissions to all state universities. Consistent with the classification scheme laid out above, selective admissions requirements shall be developed by the board within 120 days of the Implementing Date and implemented at selected Louisiana public universities by the Implementation School Year. Only five institutions are made selective directly under this Order (and one of them, SUBR, only after three years). The board has discretion to make further selectivity distinctions with the remaining institutions, so long as the admissions standards of the five selective schools designated herein clearly distinguish them from the remaining institutions.

14. State universities shall base admission decisions on some combination of high school grades, high school class rank, high school courses taken, personal recommendations, extracurricular activities, essays or personal statements, interviews and standardized test scores. The precise formulation of the criteria for each institution shall be approved by the new board. ACT and other standardized test scores provide valuable data. However, they should be used as admissions tools only in conjunction with other high school performance data. Primary emphasis shall be placed on high school grades, class rank and breadth of course work undertaken.

15. Within 120 days of the Implementation Date, the board shall develop appropriate programs of high school course work that will be required for admission at each institution. In developing these require-

8. See, e.g., Rec.Doc. No. 490, p. 18, n. 16. 718 F.Supp. at 509.

ments, the board must consult and work with the Board of Elementary and Secondary Education and the state's high schools to insure that resources are put in place to meet demand. New course work requirements must be phased in commencing with the Implementation School Year to allow high schools and students a period to adjust and shall be fully implemented by the second school year following the Implementation School Year.

16. Each state institution shall have fifteen percent of its entering class set aside for admissions exceptions. Initially, ten percent shall be used for admitting other race students (that is, black students at PWIs and white students at PBIs), with the remainder available for other institutional interest students such as athletes, students with other talents and alumni children. The precise mechanism for administering the admissions exceptions shall be developed by the president and the campus chancellors but the emphasis shall be fostering integration at each campus. Like selective admission standards themselves, the admissions exceptions shall be developed within 120 days of the Implementing Date and implemented for the Implementation School Year. The use of a ten percent other race set-aside does not mean that overall ten percent other race enrollment is acceptable. The goal is that each campus substantially increase its proportion of other race students and thus eliminate its racial identifiability; this goal demands more than ten percent other race enrollment.

### Comprehensive Community College System

17. The two-year community colleges subject to the Court's Order (LSU–Eunice, LSU–Alexandria, SU–Shreveport/Bossier City and Delgado) shall be reorganized as part of a single comprehensive community college system for Louisiana. The plan for this reorganization shall be completed within 180 days of the Implementing Date so that the community college system shall be in place by the Implementation School

Year. All two-year community colleges and vocational schools (including, for example, Bossier Parish Community College and St. Bernard Parish Community College) should be incorporated into this system. The board shall also develop an appropriate name for the new system, such as "Louisiana Southern Community College System."

18. Upon recommendation of the president, the board shall appoint a special vice-president for the community college system who will report to the board through the president. This appointment shall be made within 120 days of the Implementing Date. The special vice-president shall oversee and coordinate the affairs of all community colleges, including the appointment of chancellors at each campus.

19. The community college system vice-president and the president shall insure that, within 180 days of the Implementing Date, articulation agreements are executed between each of the community colleges and the four-year institutions for the Implementation School Year. Such agreements shall be widely advertised and shall provide for transfer of students successfully completing two-year academic degrees, although four-year institutions with selective admissions may adopt selectivity standards in admitting transfer students. The community college system shall also provide vocational and technical education and adult education, but its transfer mission, especially as it relates to minority opportunities, shall be the focus of its efforts at the outset.

20. Community colleges shall retain open admissions standards and shall emphasize remedial education courses. By the year following the Implementation School Year, the board shall concentrate remedial education courses in the community colleges, with no remedial courses remaining at four-year universities, with the exception of those comprehensive universities that retain open admissions.[9]

21. By the Implementation School Year, the remaining two-year programs at SUNO shall be transferred to Delgado leaving

---

**9.** See para. 12 of Order, p. 627, *supra*.

SUNO as the comprehensive four-year institution in New Orleans, with less selective or open admissions. The board shall study whether Delgado's offerings currently meet the demand for community college education in New Orleans and increase Delgado's offerings as needed. Within 180 days of the Implementing Date, the board shall review two-year course offerings at other four-year institutions to determine whether they should be continued or transferred.

22. The board shall study the need for and feasibility of starting new community colleges in the areas of the state where none currently exist. Special attention must be given to Baton Rouge, where a community college will be needed to service local students not able to be admitted at LSU A & M and SUBR, once both have selective admissions. The board shall, therefore, begin planning for a new college campus in Baton Rouge within the first year.

*Program Transfer and Enrollment Management*

23. With the exception of LSU Law Center and Southern Law Center, merger and/or closing of existing state universities need not be undertaken at this time. Instead, the board shall implement a system of enrollment management, program review and program transfer to address the problem of program duplication and accompanying waste of resources and segregation. The board shall assign to the president the mission of reviewing all current course offerings. Within 180 days of the Implementing Date, the president shall recommend appropriate enrollment levels for each academic program and also identify programs not meeting minimal quality standards and recommend that they be eliminated or consolidated with similar programs at other state universities.

24. The board shall then take appropriate action with respect to eliminating, consolidating and setting enrollment levels for academic programs, which shall be imple-

mented by the Implementing School Year. The board shall ensure that such action is sensitive to the desegregation goals of this plan. Thus, enrollment limits shall be set with an eye toward preventing "flight" of students to same race schools. As an example, enrollment limits at Southeastern shall be used to prevent Southeastern from becoming a "flight" school for white students not gaining admission to LSU A & M or UNO, but who are reluctant to go to SUBR or SUNO.

25. The program transfers agreed upon by Louisiana Tech and Grambling shall be implemented by the Implementation School Year. Like other programs, however, these programs are subject to further evaluation by the board and the monitoring committee, and since the Special Master no longer has jurisdiction over this case, any changes in the stipulation's proposals shall be submitted to the board. The details of the Louisiana Tech/Grambling transfers are contained in the stipulation attached as Appendix B to the Special Master's Final Report, which provisions the Court adopts as part of its Order, to the extent such provisions and their implementation are consistent with this Order.

26. By the Implementation School Year, the board shall begin implementing the merger of Southern Law Center into the LSU Law Center. To the extent consistent with the required core curriculum at each law school, the board shall immediately insure that certain high demand course offerings are not duplicated between the State's two public law schools. LSU Law School shall undertake as soon as practicable, but no later than the Implementation School Year, vigorous efforts for recruiting blacks, including ten percent admissions exceptions for black students, offering scholarships to prospective black students and appointing a special admissions officer for black students, as described in the Court's Opinion and Order entered July 19, 1989.[10]

In implementing this merger, the board shall appoint a chancellor for the new unified Law Center by the Implementation School Year who shall work with the board

---

**10.** See Rec.Doc. No. 490, pp. 26–27. 718

F.Supp. at 513–514.

to effectuate merger of faculty and curriculum and re-evaluation of existing admissions standards. In so doing, it is not the intent of this Order to damage the quality of legal education at the LSU Law Center; to require significant lowering of admissions standards; or to require any lowering of academic requirements for those students who do gain admission.

### Funding for Implementation of this Order

27. Taken into consideration funds freed by the elimination of duplicative programs, the board, in conjunction with the president and staff, shall develop budgets for the newly reclassified institutions, including non-formula expenditures for improving the quality of PBIs whenever fiscally possible. Capital needs shall be evaluated on a similar basis and priority given to those facilities that will support programs to attract other race students. The board shall complete this task within 180 days of the Implementing Date in conjunction with the Implementation School Year higher education budget submissions.

### Other Race Recruitment and Retention

28. The board shall develop a coordinated program for recruitment and retention of other race students, faculty, administrators and staff at all state universities and professional schools within 120 days of the Implementing Date. The program shall include:

(a) Scholarships for other race students. A program of scholarships designed to attract other race students to both PWIs and PBIs shall be developed by the board. A fixed percentage of each institution's overall operating budget shall be set aside for this purpose by the board upon recommendation of the president. Moreover, the board shall establish a state-wide other race scholarship program.

(b) Other race admissions officers. Each PWI and PBI shall have at least one admissions officer whose sole function is to recruit other race students. Such person shall be charged with developing, coordinating and executing all of the institution's other race student recruitment programs.

(c) Equal opportunity statements. Each institution shall develop a strong, written equal opportunity policy, both as to students and employees. This policy shall be reviewed by the special vice-president for desegregation compliance and approved by the board.

(d) Public information efforts. Under the direction of the board, each affected institution shall develop and implement significant campaigns for disseminating to prospective students and employees information about each state university, its programs and its equal opportunity policy. Among other things, public information efforts shall include the use of biracial recruiting teams from each PBI and PWI which shall visit high schools in their region and throughout the state, as appropriate.

(e) Developing relationships between high schools and colleges. The board shall identify state institutions particularly situated to benefit from special outreach programs to high schools in predominantly other race areas. Such programs shall be designed to reduce the strangeness and alienation students often associate with other race institutions. Programs shall include summer sessions in which high school students live on campus and are familiarized with a university's programs and facilities. A pilot project shall be commenced at Southeastern for the summer preceding the Implementation School Year.

(f) Incentives. The board shall set annual integration progress goals for each institution which are demanding yet realistic, and which require roughly equivalent progress at each institution. The board shall develop financial incentives for institutions that meet or exceed their annual goals. Financial rewards might include additional funds for scholarships or approval for new program offerings. Incentives shall increase by the degree to which the goal is exceeded. The board shall also consider employing "reverse incentives" or taxes for institutions which consistently fail to meet their goals.

## Monitoring Committee

29. A three-member committee shall monitor progress toward desegregation. The committee shall consist of (1) Paul W. Murrill; (2) Frank E. Vandiver; and (3) Franklyn G. Jenifer.[11] Committee members shall be paid a reasonable per diem and expenses, with Dr. Murrill and Dr. Vandiver's per diem and expenses to be taxed as costs against the State of Louisiana to be allocated to the budgets of the various institutions as the new board deems appropriate. Dr. Jenifer's per diem and expenses will be paid by the United States.

30. The monitoring committee is hereby charged with independently evaluating the progress of the new board and each institution towards specific compliance with this Order and with the overriding desegregation goals set by this Order. Copies of the minutes of all meetings of the new board shall be sent to the members of the monitoring committee within one week of each board meeting. The committee shall meet with the new board at least four times per year, and within one week after each meeting of the board and the committee, the committee shall file a report to the panel. The first meeting of the new board and the committee shall take place within 90 days of the appointment of the new board.

The committee's reports shall specifically advise the panel of the progress or lack of progress towards achieving desegregation. Each member shall have access to the Court at all times, provided such person communicates to the Court in writing, files a copy of any such communication in the record of these proceedings, and sends a copy of any such communication to the other committee members.

At least in the early stages of implementation, the monitoring committee shall be available to review and respond to decisions of the new board on an "as needed" basis.

31. The monitoring committee shall give the new board a period of five years to achieve substantial progress toward eliminating the racial identifiability of Louisiana's universities. If, at the end of five years, substantial progress is not shown, the committee shall recommend to the Court more direct solutions, including Court appointment of board members or direct control by the committee of the system of higher education and merger of institutions. However, nothing stated herein shall be construed as a divestiture of this Court's continuing jurisdiction to take appropriate action to enforce this Order.

## Interim Procedures

32. As previously indicated, the board shall be appointed and confirmed within 60 days of the Implementing Date. As each board member is appointed, the Panel shall be advised of such appointment by letter and shall be provided with a copy of such person's curriculum vitae.

If, after the Implementing Date, the Governor foresees that all board members will not be appointed and confirmed within the required time period, the Governor shall submit to the Court a proposed timetable for completing the board selection process under the guidance of the monitoring committee. If the committee deems it necessary, it may recommend to the Court names of members to serve on the board. The Court reserves the right to make any appointments necessary to complete the composition of the board in a timely fashion or to veto the appointment of any board member.

33. The board shall assume responsibility for managing the state university system and implementing this remedial Order as soon as it is formed. While its first responsibility is to search for and appoint a system president, the board should immediately appoint an interim president. The interim president shall serve until the president is selected, in order to insure that centralization of control occurs forthwith and that the steps to be taken during the

---

11. If for any reason whatsoever any of the aforesaid initially decline, or subsequently are unable to continue, to serve or resign from the Monitoring Committee, then the Court shall appoint a substitute member.

first year of the Order are not delayed. The board should have the full authority of the state, through the Governor and other state officials, to carry out its mandate. Any questions that arise during the interim period regarding implementation of this plan may be directed to the monitoring committee and by the committee to the Court, if necessary.

*Supplemental Provisions*

34. The board shall immediately desegregate the staffs and faculties of all public institutions by implementing at each state institution aggressive recruitment of qualified other race employees and nondiscriminatory assignment policies, as set forth below: [12]

(a) The board shall require each institution to take affirmative steps to recruit and hire qualified other race faculty, staff and administrators. The board shall be committed to making outreach efforts where the proportion of black administrators, faculty and staff employed at each predominantly white public institution of higher education and staff employed by each higher education board is different from the proportion of black individuals with the required credentials in the relevant labor market area. The predominantly black institutions shall also continue outreach efforts to increase their proportion of other race staff and administrators. Each institution shall, within 120 days of the Implementing Order, develop a plan for recruiting qualified other race faculty, administrators and staff, taking into account the relevant labor market data for each category of positions and documenting the data used as part of the aforementioned plan, and shall provide said plan to the board and the monitoring committee.

(b) Institutions' affirmative efforts shall include advertising in professional journals, such as the "Chronicle of Higher Education," and local newspapers, and initiating contact with universities nationwide concerning vacancy announcements.

(c) All state institutions shall take all reasonable nondiscriminatory steps to increase the number of qualified other race persons among its part-time and full-time faculties, professional administrators, and support staff positions through employing, training and promoting qualified other race persons as vacancies occur and new positions are created.

(d) Each state institution shall make a good faith effort, in addition to its existing recruitment activities, to identify qualified other race persons living and/or working within a reasonable distance of the institution who are interested in teaching on a part-time basis at the institution. Each institution shall consider the following persons: professionals, school teachers and administrators, and persons employed by businesses within a reasonable distance of the institution, who are qualified to teach the courts or courses involved. In attempting to identify persons who may be interested and available for part-time employment with the institution, each institution shall seek the assistance of professional associations, community groups, businesses, and elementary and secondary school officials.

The utilization of part-time faculty shall be consistent with accreditation requirements and the needs of the institutions, and no qualified applicant shall be denied such a position on the basis of race.

35. The four governing boards shall cease operation and their powers to be consolidated into a single board no later than 30 days after the Implementing Date, or if no single board is appointed and ratified by that time, immediately upon appointment of the single board by the Court in conjunction with the monitoring committee. [13]

36. The reports of the monitoring committee shall be filed in the record and the Clerk of Court shall mail copies of the

---

**12.** The matters set forth in item 34 generally reflect clarification requested by the United States of America and by the Southern Board of Supervisors. The specific matters set forth in subsections (a) through (d) were adopted from the United States' Proposed Plan, Rec.Doc. No. 325, pp. 23–25.

**13.** This clarification is made at the request of the United States.

report to all trial attorneys of record. The parties shall review each of the monitoring committee reports and file with the Court and mail to each of the committee members within 30 days after the monitoring committee report is filed with the Clerk any comments about progress or lack of progress in achieving desegregation.

If, upon reviewing a particular report, any party has concerns which it expressed in writing, such party or parties may meet with the monitoring committee for the purpose of discussing its concerns and offering any suggestions it may have on how problem areas may be addressed. Should such concerns not be resolved amicably, such party or parties may petition the Court for the purpose of convening a status conference and scheduling a hearing, if necessary.[14]

37. The Court's Injunction and Orders shall remain in effect until December 31 of the year seven years following the calendar year of the Implementing Date unless the plaintiff and/or another party by motion filed prior to that date request the Court to conduct a hearing for the purpose of determining whether the defendants have fully complied with the Court's Orders and/or whether or not the case should be dismissed and/or whether or not additional relief be granted. In such a hearing, the burden shall be upon movant to prove by a preponderance of the evidence that the objectives of the Order have not been achieved and/or continued and/or that additional relief is required. If that burden is carried, this Court shall enter such further Orders as are appropriate. If that burden is not carried, jurisdiction shall be terminated and this action shall be closed and dismissed with prejudice.[15]

New Orleans, Louisiana, this day of 1990.

---

14. The clarifications set forth in item 36 were requested by the United States.

15. The matters set forth in item 37 are based upon the United States' Proposed Plan, Rec.Doc. No. 325, pp. 34–35.